UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ALREMI WALCOTT,                                    :
                                                   :         **<u>OPINION AND ORDER</u>**
                                    Plaintiff,      :         10-CV-2602 (DLI) (LB)
                                                   :
                    -against-                      :
                                                   :
CABLEVISION, WILLIAM ENTENMAN and                   :
ROBERT WIESSMAN,                                    :
                                    Defendants.     :
------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Alremi Walcott ("Plaintiff") brings this action against defendants Cablevision Systems New York City Corporation ("Cablevision" or the "Company"), William Entenmann, and Robert Wiesmann (collectively, "Defendants") alleging racial discrimination stemming from Cablevision's failure to promote him and termination of his employment, as well as retaliation for Plaintiff lodging complaints of discrimination within the Company. Plaintiff claims violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and New York Executive Law § 296 ("NYSHRL"). Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion is granted in its entirety.

<u>BACKGROUND</u>

Plaintiff, an African-American male, began working for Cablevision in May 1997 as a field service technician. (Defs.' Local Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1") ¶¶ 7-8, Docket Entry No. 43; Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 7-8, Docket Entry No. 49-3.) In 2003, Plaintiff was promoted to senior field technician, Grade 14, and maintained that title until his termination in July 2008. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.)

Plaintiff worked in Cablevision's Brooklyn facility throughout his employment. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 7.)

Defendant Entenmann has been employed with Cablevision since 2006 and is presently director of administration for billing and collections in Jericho, New York. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.) From June 2006 through May 2010, Entenmann was the director of administration for Cablevision's Brooklyn facility. (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.) Defendant Wiesmann has been employed with Cablevision since 2005 and has been an area operations manager in Cablevision's Brooklyn facility throughout that time. (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.) Wiesmann and Entenmann never served as direct supervisors to Plaintiff. (Defs.' 56.1 ¶¶ 4, 6; Pl.'s 56.1 ¶¶ 4, 6.)

## I. Plaintiff's Complaints of Discrimination

### a. Work Attire Incident

In July 2005, Wiesmann and another area operations manager, Arnold Carroll, prepared and distributed to technicians in the Brooklyn facility a memorandum entitled "Technician Appropriate Dress Attire." (Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶ 84.) The memorandum stated that technicians must tuck in their shirts and that it was unacceptable to have "[s]hirt tails not tucked in." (Defs.' 56.1 ¶ 86; Pl.'s 56.1 ¶ 86.) Additionally, in August 2006, there was an initiative by management in the Brooklyn facility to ensure that technicians were wearing proper attire. (Defs.' 56.1 ¶ 88; Pl.'s 56.1 ¶ 88.)

On August 16, 2006, Wiesmann, after observing that Plaintiff and other technicians did not have their shirts tucked in, requested that Plaintiff and the other technicians tuck in their shirts. (Defs.' 56.1 ¶ 91; Pl.'s 56.1 ¶ 91; Dep. of Alremi Walcott ("Walcott Dep.") 227:7-232:14, Docket Entry No. 49-1.) Prior to this request, however, Plaintiff claims he saw

Wiesmann pass a group of white employees with their shirts untucked without comment. (Defs.' 56.1 ¶¶ 91-92; Pl.'s 56.1 ¶ 91-92.) Plaintiff did not tuck in his shirt at Wiesmann's request and told Wiesmann that he was not in violation of the Company's dress code because he was not on duty at the time. (Defs.' 56.1 ¶¶ 90-92; Pl.'s 56.1 ¶¶ 90-92; Walcott Dep. at 227:7-232:14.) Shortly thereafter, Wiesmann took Plaintiff to meet with Entenmann. (Defs.' 56.1 ¶ 94; Pl.'s 56.1 ¶ 94.) Entenmann did not discipline Plaintiff for insubordination for the incident; however, Plaintiff claims Entenmann was verbally abusive during the meeting by making statements to Plaintiff that he "would not be able to support [himself], clothe [himself] or [his] family" if Plaintiff did not follow the dress code. (Defs.' 56.1 ¶¶ 92-96; Pl.'s 56.1 ¶¶ 92-96; Walcott Dep. at 214:20-215:2.) Although Plaintiff does not recall Entenmann using any words directly referring to race during that meeting, Plaintiff believed that Entenmann's tone and word choice referred to his race. (Mem. of Law in Opp'n to Summ. J. ("Pl.'s Mem.") at 3, Docket Entry No. 49; Walcott Dep. at 214:3-216:9.)

On August 17, 2006, a follow-up meeting was held that included Plaintiff and Wiesmann, as well as Lloyd Baird, Plaintiff's supervisor, and Michael Louisor, human resources manager. (Defs.' 56.1 ¶ 98; Pl.'s 56.1 ¶ 98.) At the follow-up meeting, Plaintiff was given a copy of the July 2005 memorandum that set forth appropriate work attire for employees in the Brooklyn facility. (*Id.*) Plaintiff never was disciplined for his refusal to tuck in his shirt or for being out of uniform. (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99.)

Later that day, Plaintiff approached Louisor and told Louisor that he felt the actions of Wiesmann and Entenmann resembled some form of bigotry and he wanted to file a complaint against them. (Defs.' 56.1 ¶ 100; Pl.'s 56.1 ¶ 100.) However, the following day, August 18, 2006, Plaintiff informed Louisor to refrain from taking action because Plaintiff was meeting that

morning with Thomas Monaghan, vice president of operations, to discuss the incident.  (Defs.'
56.1 ¶ 102; Pl.'s 56.1 ¶ 102.)  Plaintiff and Monaghan spoke later that day, where Plaintiff raised
complaints about the incident.  (Defs.' 56.1 ¶ 103; Pl.'s 56.1 ¶ 103; Walcott Dep. at 267:14-
267:17.)

Although he cannot recall the circumstances or specific dates of when it occurred,
Plaintiff also claims Entenmann stated on several occasions, "you think you back on the block,"
and "[y]ou think you in the ghetto" to describe Plaintiff's appearance, and Plaintiff considered
these statements to be racially derogatory.  (Pl.'s Mem. at 4; Walcott Dep. at 205:16-205:21,
208:10-208:13.)

b. *Malcolm Hayes Incident*

On September 10, 2006, Malcolm Hayes, a field service supervisor, was on duty and in
charge of Cablevision's Brooklyn facility.  (Defs.' 56.1 ¶ 104; Pl.'s 56.1 ¶ 104.)   Hayes had
referred another technician to speak to Plaintiff; however, Plaintiff, who was scheduled to close
the facility that day, was not yet in the office.  (Defs.' 56.1 ¶¶ 105-06; Pl.'s 56.1 ¶¶ 105-06.)
Hayes then contacted Plaintiff to determine Plaintiff's whereabouts.  (Defs.' 56.1 ¶ 107; Pl.'s
56.1 ¶ 107.)  Hayes and Plaintiff had a heated verbal exchange, and, in a memorandum drafted
by Hayes to Wiesmann concerning the incident, Hayes noted that Plaintiff said he was going to
"fuck [Hayes] up because [Hayes] crossed the line."  (Defs.' 56.1 ¶¶ 107-08; Pl.'s 56.1 ¶¶ 107-
08.)

On September 11, 2006, Hayes made a formal complaint to Wiesmann against Plaintiff,
alleging that Plaintiff had threatened him with physical harm.  (Defs.' 56.1 ¶ 110; Pl.'s 56.1 ¶
110.)  Wiesmann then commenced an investigation of the incident by interviewing Plaintiff and
other technicians.  (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.)   Due to the seriousness of the

allegations, Plaintiff was suspended pending an investigation. (Defs.' 56.1 ¶ 112; Pl.'s 56.1 ¶ 112.)

On September 13, 2006, Plaintiff contacted Susan Crickmore, vice president of employee relations and human resources operations, to discuss his suspension, and Plaintiff subsequently met with Crickmore on September 15 and 19, 2006. (Defs.' 56.1 ¶¶ 116-17.)[1] During those meetings, Plaintiff informed Crickmore that he believed Wiesmann retaliated against Plaintiff during Wiesmann's investigation of the incident with Hayes because Plaintiff previously raised a complaint about Wiesmann in August 2006 concerning the work attire incident. (Defs.' 56.1 ¶ 117.) On October 11, 2006, Plaintiff met with Monaghan and Entenmann and was informed that the Company determined his actions were insubordinate, and he would be suspended for twenty-one days, reassigned to a different facility, and required to attend training regarding respect in the workplace. (Defs.' 56.1 ¶¶ 119-21.)

   c.  *Other Incidents*

Plaintiff claims that throughout his employment with Cablevision, he regularly complained at general meetings about racial discrimination. Plaintiff contends he complained at a general meeting in 2007 or 2008 that Entenmann purportedly entered an employee break room and blocked access to the Black Entertainment Channel by entering a code in the remote control that prevented the station from being viewed. (Pl.'s Mem. at 4; Walcott Dep. at 374:11-377:17, 426:4-426:7.) Plaintiff further claims he raised a complaint at a general meeting after hearing that an African-American employee in the Brooklyn facility found a noose hanging in his locker;

---

[1] Plaintiff's Local Rule 56.1 Statement fails to respond to paragraphs 114 to 133 of Defendants' Local Rule 56.1 Statement, which include facts relating to a follow up meeting and investigation concerning the incident with Hayes, as well as Plaintiff's application for an open supervisor position in June 2008. Nonetheless, the Court has reviewed the entire record, finds the paragraphs to be properly supported by evidence, and construes that evidence in the light most favorable to Plaintiff for the purposes of this motion.

however, Plaintiff could not recall when he raised this complaint or the identity of the employee whose locker purportedly had been tampered with. (Pl.'s Mem. at 3; Walcott Dep. at 125:14-125:20, 129:1-130:13, 350:1-350:18.)

Plaintiff also claims to have raised complaints at general meetings in 2006 to 2008 concerning his belief that Cablevision engaged in broader discriminatory practices with its employees and customers, although Plaintiff is unable to provide the specific dates of these complaints. First, Plaintiff claims he complained that Cablevision engaged in discriminatory practices with African-American customers by disproportionately targeting African-American neighborhoods for potential theft of service. (Pl.'s Mem. at 2; Walcott Dep. at 71:3-88-9.) Second, Plaintiff claims he complained concerning his belief that Cablevision condoned requests by white customers to have white technicians make home visits in place of minority technicians. (Pl.'s Mem. at 3; Walcott Dep. at 131:1-131:19, 349:15-349:24, 359:9-360:1, 429:5-433:9.) Third, Plaintiff claims to have complained concerning his belief that African-American employees were being paid less than white employees. (Pl.'s Mem. at 2; Pl.'s Dep. at 352:7-353:17, 355:15-360:1, 446:19-449:13.)

## II. Supervisor Application

In June 2008, Cablevision's Brooklyn facility had a vacancy for the position of supervisor. (Defs.' 56.1 ¶ 127.) Plaintiff received annual performance appraisals in which he achieved overall evaluation ratings of "Achieved Expected Performance" on January 19, 2007 and "Exceeded Expected Performance" on January 14, 2008. (Defs.' 56.1 ¶ 126.) At the time Plaintiff applied for the supervisor position, he was a Grade 14 technician and had limited outside plant experience, but the position required field service experience, with outside plant experience being an advantage. (Defs.' 56.1 ¶¶ 128, 131; Walcott Dep. at 416:1-416:11.)

Plaintiff completed two rounds of interviews for the position, the first round with Willis Ketrell, area operations manager, and the second round with Ketrell and Alex Torres, director of operations. (Defs.' 56.1 ¶ 130; Walcott Dep. at 417:17-417:21.) The Company ultimately selected another technician for the supervisor position that held a higher grade than Plaintiff (Grade 15) and had the requisite qualifications and experience in field services, as well as outside plant aspects of the business. (Defs.' 56.1 ¶ 132.)

## III. The Employee Product Benefit Program

### a. EPB Program Procedure and Policy

A benefit that Cablevision offers to certain eligible employees is free cable services, known as the Employee Product Benefit Program ("EPB Program"). (Defs.' 56.1 ¶¶ 15-16; Pl.'s 56.1 ¶¶ 15-16.) The rules for the EPB Program expressly provide that all Cablevision equipment registered to an employee as part of the EPB Program may be used only in the employee's primary residence. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 ¶ 17.) This restriction on usage is set forth in the eligibility form that employees sign when enrolling in the EPB Program. (Defs.' 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.) The EPB Program eligibility form also states that a "failure to reflect accurate information and/or notify HR/ER of any changes that would affect [the employee's] benefit in any way may result in immediate loss of benefit and corrective action, up to and including termination." (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.) Plaintiff was aware of this policy and, in 1997, 2004, and 2006, signed EPB Program eligibility forms that expressly stated the policy. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 ¶ 20.) In addition to the eligibility forms, on January 5, 2007, the Company distributed a memorandum regarding the EPB Program policy to employees within its Cable & Communications division, which included Plaintiff. (Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23.) The January 5, 2007 memorandum stated that "misuse of [the Company's] Employee Product Benefit

may result in corrective action up to and including termination." (Defs.' 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.) Plaintiff was aware of the policy contained in the January 5, 2007 memorandum. (Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.)

On March 1, 2007, the Company distributed another memorandum to employees that set forth a new procedure called Employee Equipment Verification ("EEV") for employees participating in the EPB Program to identify and verify cable equipment. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) EEV required participating employees to log into the Company's intranet system and enter zip codes and serial numbers for each piece of equipment in their possession by no later than March 30, 2007. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 ¶ 28.) Company records show that Plaintiff logged into the intranet system on March 30, 2007, verified his primary residence in Brooklyn, New York, and confirmed that he maintained seven pieces of Cablevision equipment at that location. (Defs.' 56.1 ¶¶ 30-31; Pl.'s 56.1 ¶¶ 30-31.)

*b. Audit Procedure*

In 2007, Cablevision began using Equipment Locator Technology ("ELT") to verify that its employees were adhering to EPB Program policy and using Cablevision equipment only in their primary residences (the "EPB Audit"). (Defs.' 56.1 ¶ 32; Pl.'s 56.1 ¶ 32.) Cablevision divides the borough of Brooklyn into several geographical regions called "hubs." (Defs.' 56.1 ¶ 36; Pl.'s 56.1 ¶ 36.) Using ELT technology, the Company's technical compliance department conducted tests to determine whether an employee's equipment emitted a signal from the hub, or, the geographic area, where the employee's principal residence was located. (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.) If an EPB Audit showed that the equipment registered to an employee was located outside of the hub of the employee's principal residence, a report was sent to Tamika Williams, manager in Cablevision's billing and collections department in Bethpage, New York.

(Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)  Upon receipt of a report, Williams would direct Cablevision's security department to conduct a "Drop Disconnect" test.  (Defs.' 56.1 ¶ 37; Pl.'s 56.1 ¶ 37.)  The Drop Disconnect test disconnected all Cablevision services to an employee's registered residence.  (*Id.*)  Therefore, if any of the employee's listed equipment still emitted a signal after the Drop Disconnect had been executed, there was a substantial likelihood that a violation of the EPB Program had occurred.  (Defs.' 56.1 ¶¶ 37-38; Pl.'s 56.1 ¶¶ 37-38.)

The next step of the EPB Audit involved compiling a list of all Cablevision employees whose equipment emitted signals from a location other than their registered addresses, which was then sent to senior management in the billing and collections department for further confirmation.  (Defs.' 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)  Thereafter, a final list was sent to Crickmore.  (Defs.' 56.1 ¶ 39; Pl.'s 56.1 ¶ 39.)  If an EPB Audit revealed that an employee's equipment was being used outside of his or her primary residence in violation of the policy, the employee could face termination.  (Defs.' 56.1 ¶ 33; Pl.'s 56.1 ¶ 33.)

### c.  June 2008 EPB Audit

In June 2008, pursuant to Cablevision's usual practice, Williams was asked assist with an EPB Audit to determine if there were any employees who had EPB Program equipment outside of their registered addresses.  (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.)  Williams received an outlier report (the "June 2008 Outlier Report") from the technical compliance department listing the employees whose cable equipment emitted a signal from a hub outside of their registered addresses.  (Defs.' 56.1 ¶ 41; Pl.'s 56.1 ¶ 41.)  The June 2008 Outlier Report was confidential, and Entenmann and Wiesmann were not involved in preparing it.  (Defs.' 56.1 ¶ 43; Pl.'s 56.1 ¶ 43.)  Upon verifying the information therein, Williams sent the June 2008 Outlier Report to Crickmore.  (Defs.' 56.1 ¶ 42; Pl.'s 56.1 ¶ 42.)  Plaintiff's name appeared on the June 2008

Outlier Report due to the fact that two pieces of equipment registered to him emitted signals from a location outside of the hub of his registered address. (Defs.' 56.1 ¶ 44; Pl.'s 56.1 ¶ 44.)

On June 23, 2008, Crickmore sent an email to Entenmann, notifying him that several employees from Cablevision's Brooklyn facility were listed in the June 2008 Outlier Report. (Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.) Crickmore also sent a similar email to directors in other regions. (Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Also on June 23, 2008, Crickmore held a telephone conference with a number of directors of administration from various regions to discuss the procedure for investigating the employees named in the June 2008 Outlier Report. (Defs.' 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.) Crickmore instructed the directors of administration to contact Williams to determine whether a discrepancy still existed with regard to the location of the employee's equipment. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.) If Williams confirmed that there was still a discrepancy with the employee, Crickmore instructed the directors of administration to meet with the employee to review the list of company equipment that was found be in use at a location other than the employee's registered address. (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) If the employee admitted to a violation of the EPB Program policy, Crickmore directed that the employee should be suspended. (Defs.' 56.1 ¶ 51; Pl.'s 56.1 ¶ 51.) However, if the employee denied the violation and stated that the equipment was in his or her home, the director of administration must immediately accompany the employee to his or her registered address and give the employee the opportunity to show that the equipment was actually located at the registered address. (Defs.' 56.1 ¶ 52; Pl.'s 56.1 ¶ 52.)

### d. Plaintiff's Termination

Entenmann received data sheets for eleven employees from Cablevision's Brooklyn facility suspected of violating the EPB Program policy. (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)

Plaintiff was among them. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) On June 27, 2008, Entenmann contacted Williams to determine whether there were still discrepancies with Plaintiff's equipment. (Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) On June 30, 2008, Williams responded to Entenmann's email and confirmed that two pieces of equipment registered to Plaintiff were identified as emitting signals from a geographical location other than Plaintiff's registered address. (Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.)

On July 14, 2008, Entenmann and Michael Louisor, human resources manager, met with Plaintiff and informed him of the findings of the EPB Audit. In response, Plaintiff stated that the equipment in question was located at his home. (Defs.' 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.) Entenmann and Louisor informed Plaintiff that they would have to accompany Plaintiff to his home immediately to verify the location of the equipment. (Defs.' 56.1 ¶ 63; Pl.'s 56.1 ¶ 63.)

After this meeting, Louisor and Entenmann accompanied Plaintiff to his home. (Defs.' 56.1 ¶ 64; Pl.'s 56.1 ¶ 64.) Once there, Plaintiff opened the front door, but requested that Entenmann and Louisor remain outside. (Dep. of William Entenmann ("Entenmann Dep.") at 56:2-56:8, Docket Entry No. 49-2; Walcott Dep. at 319:4-320:21.) Plaintiff did not produce the two pieces of outlying equipment for inspection that day, but rather informed Entenmann and Louisor that the equipment was located in his brother's room, the door to which was locked. (Defs.' 56.1 ¶ 65; Pl.'s 56.1 ¶ 65, Entenmann Dep. at 53:13-53:18; Walcott Dep. at 322:8-327:13.) After Plaintiff indicated his brother would be home later that evening, Louisor and Entenmann advised Plaintiff that they would return to Plaintiff's residence the following day for further inspection. (Entenmann Dep. at 59:13-59:21; Walcott Dep. at 328:2-328:6.) Louisor and Entenmann then returned to the Brooklyn facility and Entenmann advised Crickmore of these events. (Defs.' 56.1 ¶ 66; Pl.'s 56.1 ¶ 66.)

Later, on July 14, 2008, Crickmore contacted Williams and Robert Zito, director of technical compliance and field operations, and asked them to investigate whether Plaintiff's two pieces of outlying equipment still emitted a signal from a location outside of Plaintiff's hub. (Defs.' 56.1 ¶ 68; Pl.'s 56.1 ¶ 68.) A test was run on the evening of July 14, 2008 that showed the two pieces of Plaintiff's equipment still emitted a signal from a different hub. (Defs.' 56.1 ¶ 69; Pl.'s 56.1 ¶ 69.) An additional test was run the following morning that revealed the two outlying pieces of equipment had been shut down at 7:00 a.m. that morning. (Defs.' 56.1 ¶ 70; Pl.'s 56.1 ¶ 70.)

Later on July 15, 2008, Entenmann and Louisor returned to Plaintiff's home and verified that Plaintiff now possessed all of the Company equipment registered to him under the EPB Program, including the two outlying pieces of equipment that had not been produced to Entenmann and Louisor the previous day. (Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73.) Plaintiff contends that because Entenmann and Louisor planned to return that day, Plaintiff's brother had unhooked the two pieces of equipment and made them available to Plaintiff that morning before he left for work. (Pl.'s 56.1 ¶ 71.)

Plaintiff was suspended on the afternoon of July 15, 2008. (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.) After speaking with Entenmann, Sam Magliaro, managing director of the Brooklyn facility, decided to terminate Plaintiff's employment with the Company. (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.) Wiesmann had no knowledge of the June 2008 EPB Audit or Plaintiff's termination and was on leave of absence from the first week of July 2008 through October 2008. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.)

In 2008, besides Plaintiff, twenty-six other Cablevision employees were also terminated for violations of the EPB Program policy. (Defs.' 56.1 ¶ 79; Pl.'s 56.1 ¶ 79.) In total, nine of

those employees were Caucasian, nine were African American, seven were Hispanic, and two were Asian.  (Defs.' 56.1 ¶ 79; Pl.'s 56.1 ¶ 79.)

On November 25, 2008, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC").[2]  (Defs.' 56.1 ¶ 133.)  On June 8, 2010, Plaintiff commenced this action, claiming race discrimination and retaliation under Title VII and NYSHRL.[3]  (*See generally* Verified Compl. ("Compl."), Docket Entry No. 1.)

## DISCUSSION

## I.     Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  "When no rational jury

---

[2] There are no details in the record concerning the receipt of a "Notice-of-Right-to-Sue" from the EEOC.

[3] Although Plaintiff also alleged in his Complaint that "Defendants' harassment of [P]laintiff was so severe and pervasive that it created an intimidating, hostile and offense work environment," (Compl. ¶ 23), Plaintiff did not advance a hostile work environment theory in his summary judgment opposition.  Therefore, the Court deems it abandoned.  *See Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *17 (E.D.N.Y. Apr. 19, 2007).

could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)).

"The Second Circuit has stated that district courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Figueroa v. New York Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 227-28 (S.D.N.Y. 2007) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)) (internal quotation marks omitted). Summary judgment in an employment discrimination case may still be warranted, however, if the plaintiff relies "'on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct.'" *Id.* (citation omitted). "This is because, as the Second Circuit has stated, '[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" *Id.* (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## II. Timeliness of Claims

In New York, Title VII claims are time-barred if a plaintiff does not file a charge with the appropriate administrative agency within 300 days of the occurrence of the alleged discriminatory practice. *Gandarilla v. Sanchez*, 2012 WL 3525607, at *4 (S.D.N.Y. Aug. 15, 2012) (citing 42 U.S.C § 2000e-5(e)(1)). The statute of limitations on state claims brought under NYSHRL is three years from the alleged act of discrimination. *Van Zant v. KLM Royal Dutch*

*Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (citing N.Y. C.P.L.R. 214(2)).

Defendants contend that because Plaintiff filed his EEOC charge on November 25, 2008 and his Complaint on June 8, 2010, any Title VII claims based on incidents that occurred before January 30, 2008 and any NYSHRL claims based on incidents that occurred before June 8, 2007 must be dismissed as untimely. (Mem. of Law in Supp. of Defs.' Mot. For Summ. J. ("Defs.' Mem.") at 4, Docket Entry No. 42; Reply Mem. of Law in Further Supp. of Defs.' Mot. For Summ. J. ("Defs.' Reply Mem.") at 2-3, Docket Entry No. 50.) Although Plaintiff does not present his arguments in an organized fashion or with clarity, Plaintiff counters that the Court should not disregard the evidence because it demonstrates "longstanding discriminatory practice at Cablevision" and is "part of a continuing violation of [Plaintiff's] civil rights." (Pl.'s Mem. at 8-9.)

While Defendants are correct that discrete acts are not actionable if time barred, the only adverse employment actions that Plaintiff appears to rely on to support his discrimination and retaliation claims are the Company's failure to promote him in June 2008 and his termination in July 2008. (*See generally* Pl.'s Mem.) For instance, although Plaintiff repeatedly refers to the August 2006 work attire incident in his opposition papers (Pl.'s Mem. at 3, 4, 8), Plaintiff admits that he was not disciplined, formally or informally, in connection with the event (Defs.' 56.1 ¶ 99; Pl.'s 56.1 ¶ 99), and Plaintiff does not argue that he suffered an adverse employment action as a result of it. Instead, Plaintiff appears to rely on that incident, along with a series of other allegations of discriminatory conduct that occurred in 2006 and 2007, as evidence to support his timely discrimination and retaliation claims. Therefore, the Court will consider incidents from 2006 and 2007 on this basis. *See Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 483 (S.D.N.Y. 2009) ("[W]hile 'discrete discriminatory acts are not actionable if time barred,

even when they are related to the acts alleged in timely filed charges,' Title VII does not 'bar an employee from using the prior acts as background evidence in support of a timely claim.'") (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

## III. Title VII Race Discrimination

### A. Legal Standard

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail against a motion for summary judgment in a discrimination case, the claimant must satisfy the three-part burden-shifting test laid out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "[A] plaintiff first bears the minimal burden of setting out a *prima facie* discrimination case." *McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006) (citations and internal quotation marks omitted). To establish a *prima facie* case of race discrimination, a plaintiff must demonstrate that: (1) he was a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Collins v. New York City Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

The defendant may then rebut by articulating a legitimate, nondiscriminatory reason for its adverse employment action. The defendant's burden at this stage is merely one of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). Once the defendant meets the burden of producing a legitimate reason for the adverse employment action, "[t]he presumption [of discrimination], having fulfilled its role of forcing the defendant to come

forward with some response, simply drops out of the picture." *Id.* at 510-11.

The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that the employment decision was motivated by unlawful discrimination. *See Stern v. Trs. of Columbia Univ. in the City of New York*, 131 F.3d 305, 312 (2d Cir. 1997). "It is not enough, in other words, to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Valcin v. New York City Dept. of Homeless Servs.*, 2010 WL 1257603, at *2 (S.D.N.Y. Mar. 30, 2010) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original).

### B. Discussion

#### i. Termination

Plaintiff argues his termination in July 2008 resulted from discrimination, and accordingly, the Court assumes for the purposes of this motion that Plaintiff has established a *prima facie* case of discrimination.[4] However, Cablevision has demonstrated a legitimate, nondiscriminatory reason for Plaintiff's termination, namely, that the Company conducted an audit and found that cable equipment registered to Plaintiff emitted signals from a geographical location away from Plaintiff's primary residence, which suggested that Plaintiff had violated the EPB Program policy. *See Welland v. Citigroup, Inc.*, 2003 WL 22973574, at *6 (S.D.N.Y. Dec. 17, 2003) ("Discharging an employee for violating company policy constitutes a legitimate nondiscriminatory reason for terminating employment."). Therefore, the burden shifts to Plaintiff to present evidence from which a reasonable jury could find that Cablevision's

---

[4] *See Estate of Hamilton v. City of New York*, 627 F.3d 50, 55 (2d Cir. 2010) ("For sake of the argument, we assume, as did the District Court, that plaintiffs made a prima facie showing of discrimination on the basis of race, national origin, and sex.")

proffered reason is pretextual and that his termination was motivated by unlawful discrimination. Plaintiff has failed to make this showing.

A plaintiff can demonstrate that an employer's proffered reason is pretextual by evidence that similarly situated employees in a non-protected class have been treated more favorably. *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). However, Plaintiff fails to provide evidence of any material difference between his own treatment and that of similarly situated Cablevision employees. Plaintiff does not dispute that the June 2008 EPB Audit was a companywide audit, or that twenty-six other Cablevision employees, including nine Caucasian, nine African-American, seven Hispanic, and two Asian employees, were terminated for violating the EPB Program policy. (Defs.' 56.1 ¶¶ 39-40, 79; Pl.'s 56.1 ¶¶ 39-40, 79.)

Nor does Plaintiff present evidence that Cablevision deviated from its general policies and procedures when it terminated him. *See Meiri*, 759 F.2d at 998 (affirming dismissal where "[plaintiff] offered no evidence . . . that the INS departed from its general policies in discharging her; or that non-Jewish persons on probation who acted similarly were retained.") Moreover, Plaintiff's suggestion that the results of the June 2008 EPB Audit were "erroneous" due to flaws in Cablevision's equipment locator technology (Pl.'s 56.1 ¶ 72; Pl.'s Mem. at 6-7), accepted as true for the purposes of this motion, also is not sufficient to demonstrate that Cablevision's proffered reason for termination is pretextual. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 169 (2d Cir. 2001) (holding that employer's good faith belief that employee engaged in work-related fraud was legitimate non-discriminatory reason to terminate employee, regardless of "[w]hether or not fraud actually occurred"); *Ozemebhoya v. Edison Parking Corp.*, 2007 WL 2593008, at *7 (S.D.N.Y. Sept. 7, 2007) ("[T]he Court need not revisit whether [plaintiff] did, in fact, violate [the employer's] policies, as plaintiff has invited the Court to do. Instead, the Court

must only determine [the employer] reasonably believed that he had violated company policies when he was terminated.").

Plaintiff also fails to demonstrate that his termination was motivated by unlawful discrimination. In attempting to do so, Plaintiff relies primarily on a selection of statements and actions by Wiesmann and Entenmann. As to Wiesmann, Plaintiff claims that, in August 2006, Wiesmann requested that Plaintiff tuck in his shirt, but did not request the same of white employees, and that Wiesmann participated in a meeting in which Plaintiff was spoken to in a derogatory tone. (Pl.'s Mem. at 3-5; Pl.'s 56.1 ¶¶ 89-97.) However, there is no dispute that Wiesmann was on leave of absence in July 2008 and had no knowledge of the June 2008 EPB Audit or Plaintiff's termination. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.) Thus, any prior statements attributable to Wiesmann, an individual who had no involvement with or knowledge of Plaintiff's termination, will not support a claim of discrimination. *See Dawson v. Bumble & Bumble*, 246 F. Supp. 2d 301, 325 (S.D.N.Y. 2003), *aff'd*, 398 F.3d 211 (2d Cir. 2005) ("Allegedly discriminatory remarks by nondecisionmakers, or by officers with general authority to hire and fire but who played no role in the plaintiff's dismissal, are insufficient to create an issue of disputed fact for trial.").

As to Entenmann, Plaintiff relies primarily on the following events to demonstrate unlawful discrimination: (1) in August 2006, Entenmann spoke to Plaintiff in a derogatory tone in a meeting related to the work attire incident; (2) sometime in 2007, Entenmann blocked access to the Black Entertainment Channel in an employee break room; (3) in July 2007, Entenmann was disciplined for discussing the religious make up of golf courses; and (4) on various dates that Plaintiff could not recall with specificity, Entenmann said statements such as "you think you back on the block," and "[y]ou think you in the ghetto." (*See* Pl.'s Mem. at 4-8.) None of these

isolated incidents occurred in connection with or in proximity to Plaintiff's termination in July 2008 and are insufficient to raise an inference of discrimination. *See Amna v. New York State Dep't. of Health*, 2011 WL 4592787, at *7 (E.D.N.Y. Sept. 30, 2011) ("'[S]tray remarks' and minor occurrences unrelated to the adverse employment action generally do not raise an inference of discrimination."); *Smith v. Revival Home Health Care, Inc.*, 2000 WL 335747, at *4 (E.D.N.Y. Mar. 28, 2000) ("Statements made long before and not in the context of the adverse action cannot support a claim of discriminatory motive for that action."). Although Entenmann had involvement with the June 2008 EPB Audit, Plaintiff does not identify any discriminatory statements made by Entenmann, or any other Cablevision employee, in the context of the June 2008 EPB Audit or Plaintiff's termination.[5]

Nor is Plaintiff's testimony concerning a series of other incidents sufficient to create a factual dispute as to Cablevision's discriminatory intent. First, Plaintiff's testimony that Cablevision pays African-American employees less than white employees appears to be based entirely on discussions Plaintiff had with other employees on the topic, including certain white technicians at Cablevision that told Plaintiff that they earned more than him. (Walcott Dep. at 355:15-360:1.) When pressed, however, Plaintiff could not identify the name of a white technician that had told him this. (Walcott Dep. at 358:2-359:4.)

Second, although Plaintiff testified that Cablevision disproportionately targets African-American neighborhoods for potential theft of service claims, Plaintiff's testimony reveals that he does not have personal knowledge of Cablevision's theft investigation procedures and

---

[5] After Entenmann visited Plaintiff's residence in July 2008 and reported his findings internally, Crickmore instructed Entenmann to suspend Plaintiff, and Magliaro decided to terminate Plaintiff thereafter. (Aff. of Susan Crickmore ¶¶ 37, 39, Docket Entry No. 46; Entenmann Dep. at 66:10-71:17.) However, Plaintiff does not attribute any discriminatory comments or actions to Crickmore or Magliaro.

policies. (Walcott Dep. at 77:18-78:5, 86:3-86:7.) Rather, Plaintiff's belief that Cablevision disproportionately targets African-American customers appears to be based on his personal observation that the majority of customers he has been sent to investigate for theft were racial minorities. (Walcott Dep. at 72:22-73:11, 75:8-86:2.)

Third, although Plaintiff attempts to rely on his own testimony to claim that Cablevision condoned requests by white customers to have white technicians visit their homes in place of black technicians, the only instance that Plaintiff testified to with any specificity was one that was "told" to Plaintiff by his coworker. (Pl.'s Mem. at 2-3; Walcott Dep. at 349:5-349:19; 429:5-433:19.) Plaintiff also testified that he had been removed from an assignment in a white customer's home and replaced by a white Cablevision employee; however, Plaintiff also admitted that he does not know whether or not the customer actually requested a white technician for that assignment. (Walcott Dep. at 429:18-430:10.)

Fourth, Plaintiff's testimony that an African-American employee found a noose hanging in his locker is based on what Plaintiff was told by another co-worker; however, Plaintiff did not personally see the noose, could not identify the employee whose locker had been involved, and could not specify when the event occurred. (Walcott Dep. at 125:14-127:11.) Plaintiff's conclusory and speculative testimony on these topics are unsupported by any empirical data or proper evidentiary support and do not create a genuine issue of material fact as to whether his termination was the result of discrimination. *See Meiri*, 759 F.2d at 998 ("conclusory allegations of discrimination are insufficient" to prevent summary judgment); *Zinnamon v. New York City Civilian Complaint Review Bd.*, 2010 WL 3516218, at *6 (E.D.N.Y. Aug. 30, 2010) (dismissing Title VII claim where "[p]laintiff's only evidence [of discrimination] . . . came from her conversations with individuals who 'told her'" and "[p]laintiff's statements as to what she 'was

told' are hearsay that would not be admissible at a trial"); *McLaughlin v. New York City Bd. of Educ.*, 2008 WL 216308, at *12 (S.D.N.Y. Jan. 22, 2008) ("[C]onclusory statements are not sufficient to create a genuine issue of material fact regarding the Defendants' motivation for his termination.")

In sum, Plaintiff has failed to provide sufficient evidence to create an issue of fact that Cablevision's asserted reason for Plaintiff's termination is false or that Plaintiff's race was the real reason for his termination.

ii.     Failure to Promote

In order to establish a *prima facie* case for failure to promote, a Title VII plaintiff ordinarily must demonstrate that: "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Estate of Hamilton v. City of New York*, 627 F.3d 50, 55 (2d Cir. 2010) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)).[6] The Court assumes, *arguendo*, that Plaintiff can establish a *prima facie* case, thereby shifting the burden to Cablevision to demonstrate a legitimate, nondiscriminatory reason for rejecting Plaintiff for the supervisor position.

Cablevision has submitted evidence that a successful candidate for the supervisor position needed to have field experience, with outside plant experience also being an advantage. (Defs.' 56.1 ¶ 128.)  At the time Plaintiff applied for the supervisor position, he was a Grade 14 technician and had limited outside plant experience.  (Defs.' 56.1 ¶ 131.)  Cablevision has also

---

[6] While a failure to promote can constitute a material adverse employment action, it is generally considered a separate cause of action.  *Williams v. City of New York*, 2012 WL 3245448, at *6 (S.D.N.Y. Aug. 08, 2012).

submitted evidence establishing that the candidate selected for the supervisor position was of a higher grade than Plaintiff (Grade 15), and, unlike Plaintiff, also had the requisite qualifications in both field services and outside plant aspects of the business. (Defs.' 56.1 ¶¶ 131-32.) Cablevision has therefore demonstrated a legitimate, nondiscriminatory reason for refusing to promote Plaintiff. *See, e.g.*, *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) ("The evidence that defendant filled these two positions with white applicants who were more qualified than plaintiff rebuts any presumption of discrimination.").

Plaintiff fails to put forth any evidence to suggest that Cablevision's articulated reasons are pretextual. Plaintiff has offered no evidence to dispute the Company's assertion that outside plant experience was advantageous for the supervisor position or that Plaintiff was less qualified than the successful candidate. Instead, Plaintiff attempts to demonstrate pretext by relying on his own self-serving testimony that he believed he was the most qualified candidate based on a conversation he had with Ketrell. (Pls. Mem. at 4; Walcott Dep. at 419:8-423:3.) Plaintiff's reliance on his own testimony is insufficient to demonstrate pretext under these circumstances. *See Holt*, 95 F.3d at 130 (concluding that plaintiff failed to show pretext where plaintiff's "personal belief that she was the most qualified person for the various positions . . . [was] belied by the facts which indicate[d] that the people who received the promotions had more experience than plaintiff").

Plaintiff also fails to demonstrate that Cablevision's employment decision was motivated by unlawful discrimination. Plaintiff testified that Ketrell and Torres, the two individuals that interviewed him for the job, did not make discriminatory comments during his interviews. (Walcott Dep. 418:17-419:7.) Plaintiff also does not identify any discriminatory remarks or actions by any other employee that occurred in connection with or in relation to the interview

and selection process for the supervisor position. Additionally, prior comments and actions by Wiesmann and Entenmann, as well as Plaintiff's assertions that Cablevision engaged in broader discriminatory practices by paying white employees more than black employees, targeting black customers in a discriminatory manner, and replacing black technicians with white technicians, fail to demonstrate unlawful discrimination for the same reasons previously discussed. *See supra*, Part III.B.i.

Accordingly, Plaintiff's failure to promote claim is dismissed.

## IV.    Title VII Retaliation Claim

### A.  Legal Standard

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Retaliation claims under Title VII are analyzed under the *McDonnell Douglas* burden-shifting test described above. *Coffey v. Dobbs Int'l Servs., Inc.*, 170 F.3d 323, 326 (2d Cir. 1999). *See supra*, Part III.A. To establish a *prima facie* case of retaliation, a plaintiff must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008) (citation omitted). Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

*B. Discussion*

Plaintiff describes himself as "an extremely outspoken employee . . . [that] made numerous complaints to supervisors and management about racism at Cablevision." (Pl.'s Mem. at 1.) Specifically, Plaintiff claims that he made complaints of racial discrimination "[f]rom 2006 to the point where [Plaintiff] was terminated" in July 2008. (Pl.'s Mem. at 1-8.) Cablevision does not dispute that Plaintiff engaged in protected activity and suffered an adverse employment action, but argues that Plaintiff cannot establish a *prima facie* case because he cannot demonstrate a causal connection. (Defs.' Mem. at 20-21.)

Any complaints made by Plaintiff in 2006 and 2007 would not establish a causal connection to the Company's failure to promote him in June 2008 and Plaintiff's termination in July 2008. Although a causal connection "can be established indirectly by showing that the protected activity was closely followed in time by the adverse action," *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and internal quotation marks omitted), "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close," *Cunningham v. Consol. Edison Inc.*, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (internal quotation marks omitted)). District courts in the Second Circuit "have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007); *see also Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (upholding district court's grant of summary judgment on retaliation claim where there

was only three months between protected activity and termination, and plaintiff submitted no other evidence of causal nexus); *Cobian v. New York City*, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000), *aff'd*, 23 F. App'x 82 (2d Cir. 2001) (holding that, standing alone, a four-month gap between filing of plaintiff's EEOC claim and adverse employment action was insufficient to establish causal connection); *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and the alleged act of retaliation."). Plaintiff's inability to establish a causal connection to any complaints made in 2006 and 2007 is further demonstrated by Plaintiff's annual performance appraisals from January 19, 2007 and January 14, 2008, which stated that Plaintiff achieved an overall evaluation rating of "Achieved Expected Performance" and "Exceeded Expected Performance" respectively. (Defs.' 56.1 ¶ 126.) *See Dayes v. Pace University*, 2 F. App'x 204, 208 (2d Cir. 2001) (affirming summary judgment where "the inordinate amount of time between [plaintiff's] complaint about [her supervisor's] conduct and his negative review, especially given his intervening positive review, defeats [plaintiff's] attempt to establish a causal connection between the two events").

As to Plaintiff's complaints in 2008, although Plaintiff asserts in his opposition brief that he raised those complaints "in a series of general meetings, including meetings held in July of 2008" (Pl.'s Mem. at 2), Plaintiff has no documentation of these complaints and could not testify as to the precise dates.[7] Nonetheless, construing the testimony in the light most favorable to Plaintiff, the Court assumes that the alleged temporal nexus is sufficiently close to establish the causal connection and a *prima facie* case.

---

[7] For example, when asked to specify the date for one of his more recent complaints, Plaintiff stated, "I can't remember the exact month, but it was 2008, sometime May, June, July, sometime around there. I can't remember the exact date or month, but it was in 2008." (Walcott Dep. at 447:12-448:9.)

After a plaintiff makes a *prima facie* case of retaliation and the defendant offers a non-discriminatory reason, summary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact. *Garrett*, 2007 WL 1174891, at *21 (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)). Plaintiff's retaliation claims still must fail. As noted, Plaintiff has produced no evidence to demonstrate that Cablevision's proffered reasons for failing to promote him to the supervisor position and for terminating him were false or pretextual. *See supra*, III.B.

Additionally, Plaintiff points to no evidence that retaliation was the real reason for the adverse employment actions. Plaintiff relies on the temporal proximity of his complaints throughout 2008 to the adverse employment actions that occurred in June and July 2008. At the third step of the *McDonnell Douglas* test, however, "mere temporal proximity is insufficient, standing alone, to withstand summary judgment where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor." *Bagley v. J.P. Morgan Chase & Co.*, 2012 WL 2866266, at *11 (S.D.N.Y. July 12, 2012) (internal quotations and citations omitted); *Smiley v. Cassano*, 2012 WL 967436, at *9 (S.D.N.Y. Mar. 21, 2012) ("Even assuming that Plaintiff *could* prove causation through mere temporal proximity at the *prima facie* stage, such temporal proximity alone would be insufficient to rebut Defendant's legitimate non-retaliatory reason for the challenged employment decisions.") (emphasis in original); *Vosatka v. Columbia Univ.*, 2005 WL 2044857, at *10-11 (S.D.N.Y. Aug. 25, 2005) (collecting cases and holding that "close temporal proximity . . . alone, is insufficient as a matter of law to infer discrimination on the part of [defendant] once [defendant] has proffered legitimate non-discriminatory reasons").

Aside from temporal proximity, Plaintiff offers no other evidence of retaliation. Relying

on his own testimony, Plaintiff contends his complaints about racism at a general meeting in 2008 "disturbed" Torres, who previously had interviewed Plaintiff for the supervisor position in June 2008. (Pl.'s Mem. at 5.) However, Plaintiff testified that he did not have first-hand knowledge concerning Torres' reaction; instead, Plaintiff's belief that Torres was disturbed is based on what another co-worker, Brian Clubham, "told" Plaintiff on the matter (Walcott Dep. at 446:19-449:13) and, therefore, does not create an issue of material fact. *See Zinnamon*, 2010 WL 3516218, at *6. Plaintiff does not identify any other instances where Cablevision reacted negatively or improperly to his complaints that could be used to demonstrate retaliatory motive; rather, Plaintiff claims that he repeatedly was told that the Company would "look into it" when he complained of discrimination on other occasions. (Pl.'s Mem. at 3.) Plaintiff also does not demonstrate that persons who did not engage in protected activity were treated differently than he was.

Thus, Plaintiff's failure to carry his burden requires dismissal of his retaliation claim.

## V.     Mixed Motive Analysis

Plaintiff also argues that summary judgment must be denied under the "mixed motive" analysis. (Pl.'s Mem. at 10-15.) "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support . . . allegations of discriminatory treatment." *Barney v. Consolidated Edison Co. of New York*, 2009 WL 6551494, at *20 (E.D.N.Y. Oct. 01, 2009), *aff'd*, 391 F. App'x. 993 (2d Cir. 2010) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 60-61 (2d Cir. 1997). Evidence potentially warranting a mixed motive analysis includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude. *Raskin*, 125 F.3d at 60-61; *see also Dixon v. Int'l Fed'n of Accountants*, 2010 WL

1424007, at *3 (S.D.N.Y. Apr. 09, 2010) (granting summary judgment for defendant and holding that "[p]laintiff [was] not entitled to a mixed-motive analysis, because she ha[d] not satisfied the heightened burden of producing a smoking gun or at least a thick cloud of smoke to support her allegations of discriminatory treatment") (quoting *Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006)) (internal quotations omitted); *Cramer v. Pyzowski*, 2007 WL 1541393, at *9-10 (E.D.N.Y. May 25, 2007) (same). Plaintiff has failed to meet this burden. Accordingly, a mixed motive analysis is not appropriate and Plaintiff's claims cannot survive summary judgment under this analysis.

## VI. NYSHRL Claims

Plaintiff also argues that his race discrimination and retaliation claims are actionable under NYSHRL. *See* N.Y. Exec. Law §§ 290 *et seq.* ("[T]he state has the responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life . . . ."). Claims of race discrimination and retaliation brought pursuant to NYSHRL are generally analyzed under the same standards as those for Title VII claims. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000). Accordingly, Plaintiff's claims under NYSHRL must be dismissed.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is granted in its entirety and the Verified Complaint is dismissed with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
September 24, 2012

_____
/s/
DORA L. IRIZARRY
United States District Judge